(71 South. 355)

No. 20316.

O'NEAL v. BIG PINE LUMBER CO., Limited.

(March 6, 1916. Rehearing Denied April 3, 1916.)

*(Syllabus by the Court.)*

RAILROADS ⨺276(3)—OPERATION—INJURIES TO TRESPASSERS—LIABILITY.

Where a boy of 12, seated, though as a mere trespasser, on the edge of a flat car in a siding, is seen, at a distance of 75 yards, by the engineer of a locomotive who is backing it into the siding to make a drop switch, and the speed of the locomotive is such as, with its weight, to threaten the car with destruction and the boy with death, the engineer owes the duty, from the moment that he sees the boy, of doing everything that it is possible for him to do to avoid injuring him, and is guilty of negligence in failing to make any attempt to check the speed of the locomotive. And where, in such case, the boy jumps off the car, and in scrambling away from the threatened danger gets upon the main track and is injured by the cars which the locomotive has dropped, and which are running on that track without brakes or brakemen, the company employing the engineer is responsible, in damages, for the injuries received by the boy. It is well settled that one who negligently places another in danger cannot exact of him the exercise of the most deliberate judgment in his attempt to escape therefrom.

[Ed. Note.—For other cases, see Railroads, Cent. Dig. §§ 880–883; Dec. Dig. ⨺276(3).]

Provosty, J., dissenting.

Appeal from Thirteenth Judicial District Court, Parish of Grant; W. F. Blackman, Judge.

Action by John M. O'Neal against Big

Pine Lumber Company, Limited. From a judgment for plaintiff, defendant appeals. Affirmed.

John A. Williams and C. H. McCain, both of Colfax, for appellant. W. C. & J. B. Roberts, of Colfax, and Grisham & Oglesby, of Winnfield, for appellee.

### Statement of the Case.

MONROE, C. J. Defendant has appealed from a verdict and judgment of $1,500, awarded as damages for personal injuries sustained, through alleged negligence of its agents, by plaintiff's minor son. Plaintiff has answered the appeal, praying for an increase in the amount of the award.

It appears from the evidence that defendant owned a logging road that ran east and west; that it had a commissary store at a certain point on the road, for about a quarter of a mile in each direction, from which, upon each side of the road, were the quarters of its employés, constituting, with their families, a population of about 200 persons; that to the westward of the commissary, and at about the west end of the little hamlet (or, say, a quarter of a mile distant), there was a switch, from which a spur track branched off on the south side of the main track, ran along about parallel with it, at a distance from the main track of from 12 to 32 feet, and then led off into the woods, but the rails of which, at some time prior to the accident here in question, had been taken up to a point within, say, 240 feet of the switch, leaving that much of the spur as a storage and switching track; the practice of defendant having been, as we infer, to start in the mornings, from the mill, to the eastward of the commissary, and complete the making up of its trains and the picking up of its employés at or about the commissary and the switch, whence the cars and employés would be conveyed to the places where they were needed for the work of the day. Plain-

tiff was engaged in getting out railroad ties for defendant under contract, and lived about three-quarters of a mile to the north of its main track, the lane from his house leading to a point on that track about, say, 150 feet to the westward of the switch, and hence a little more than a quarter of a mile to the westward of the commissary, though we infer that the commissary might have been reached from plaintiff's house by taking the hypotenuse, rather than the two sides, of the triangle, and the evidence shows that there were paths leading to that establishment along the sides of, as well as upon, the tracks. Early in the morning of August 2, 1912, plaintiff instructed his son, an intelligent boy, 12 years of age, to go to the commissary and get supplies of some kind, and the boy proceeded down the lane until he reached the tracks, where he found two skeleton logging cars and an open flat car on the siding or spur track, the flat car being to the eastward of the others. He also found another boy, whom he knew, and who was in defendant's employ, on the flat car, and they both knew that an engine would presently come along and take out the flat car, which would be needed for the transportation of the employés. The other boy suggested to young O'Neal that he, too, should get on the flat car and ride to the commissary, and, although both the O'Neals, father and son, testify that the latter had been forbidden to ride on defendant's trains, and had been whipped for disobedience in that respect, he nevertheless got on the car and seated himself on the north side, with his legs hanging over the edge, while the other boy occupied a similar position on the south side. Presently an engine, moving backward and pulling 12 logging cars, passed the commissary and whistled and the engineer, having, in that way, attracted the attention of Stewart, one of defendant's employés who was conveniently situated, gave a signal for a "drop switch,"

which meant that his purpose was, upon nearing the switch, to uncouple the engine, give it additional momentum sufficient to enable it to run away from the cars and into the switch, and to enable Stewart then to close the switch so that the cars, being still in motion, would go on down the main track; the idea being that the engine would pull the flat car, or perhaps, the three cars, out of the switch, and then back down on the main track, get the 12 cars, and have the train made up, and the engine in proper position with the cars behind the tender. Stewart, accordingly, opened the switch, and the engine entered, and he then closed it and the 12 cars passed on down the main track. But the engine entered the switch at a high rate of speed, the circumstances considered, and the engineer did not check it; and the two boys, who were seated on the flat car with which it was threatening to collide, became alarmed, and, at the suggestion of the other boy, who was probably older than O'Neal, they jumped off from the respective sides upon which they were sitting. The testimony conflicts as to whether the main track was 14 feet or 32 feet from the spur; it shows that the space between the tracks was about 2½ feet lower than the surface of the tracks; and that O'Neal, having jumped to escape the approaching engine, kept his attention upon it, whilst scrambling out of its way, with the result that he found himself standing upon the ends of the cross-ties of the main track, looking at the engine, about the time that it struck the car upon which he had been seated, and about that time, also, he was struck by the train of cars which were passing down the main track and received the injuries of which he complains. It is said that the car furthest to the westward of the 3 that were on the spur track had already been partially derailed, and it is shown that the 3 were knocked off the track, down the bank, by the impact of the engine and that the drawhead of the flat car and drawbolt of the engine were broken thereby. The engineer admits that he saw the boys on the flat car, but it does not seem to have occurred to him that it was a matter in which he was at all concerned. His testimony reads, in part, as follows:

Examination in chief:

"Q. When you came into the hole, or on the side track, that morning, what was the speed that you were traveling? A. Something like 8 or 10 miles per hour when I approached the switch. * * * Q. Were you exceeding the speed necessary at that time? A. I was doing the work, and was running at a speed necessary to make the clearance that I speak of. Q. You handled the business out there? A. Yes, sir; I handled the business out there and got out the logs. It is not a very easy matter to handle a log train on log spurs that are newly constructed and rarely ever put up in first-class shape."

Cross-examination:

"Q. Did you notice the boy on the flat car? A. I did. Q. When you saw him on the car, how far do you think that you were from him? A. I suppose I was 75 yards from him, at least. Q. Were you backing down? A. I was backing my engine into the side track. * * * Q. Now you say you saw the boy on the car? A. Yes, sir. Q. You did not do, or cause to be done, anything to have him get off? A. No, sir; I was doing my work; I had the front end of the engine to look after, until we were in the clear, and then the back end. The boy jumped off I know. Q. He jumped off before you hit the car? A. I judge he did; I was very busy at that time with the engine and was not looking at him. * * * Q. Was there any reason why he should have jumped from that car? A. Nothing that I know of. * * * Q. With what speed did you hit that car? A. It was somewhere between 8 and 10 miles an hour. Q. Did you not think that was too great speed? A. I did not think about it at all. I was working with the engine; the sand was not working, and the engine was new and stiff; hard to stop. * * * Q. You did knock the car off the track? A. I think that I did."

The witness Stewart estimates the speed of the train at 12 or 15 miles an hour, and he says that the drawhead on the tender of the engine was broken. O'Neal, Sr., testifies that he found the three cars that had been on the spur track, "down on the bank; they were knocked off"; that the drawhead of the flat car was broken and also the steel draw-

bar of the engine (meaning, of course, of the tender); and that the 12 cars had gone down the main track for at least a half a mile beyond the point at which the accident occurred, having, as otherwise appears, neither brakes nor brakemen on board of them. And there is no contradiction of his testimony on either point.

It is shown that instructions were given, and posted, prohibiting the carrying of passengers, other than employés, on defendant's trains, but that they were not generally obeyed by those in charge of the trains. It is also shown that the tracks, about the scene of the accident were as commonly used as highways as the paths on the sides of them, though it does not appear that defendant encouraged that practice.

### Opinion.

The boy was, no doubt, at fault in getting on the flat car, but from the moment that the engineer actually saw him, he owed the duty of doing everything that it was possible for him to do to avoid injuring him. According to his own testimony, he knew that his engine was approaching the open flat car (upon the edge of which, with his legs hanging over, the boy was seated) at the rate of 8 or 10 miles an hour, and Stewart, who acted as switchman and saw the engine pass, estimates its speed at 12 or 15 miles an hour. It is beyond dispute that the speed, plus the weight of the engine, were sufficient to knock the car off the track, down the bank. Hence the boy was in imminent danger; and, though it is possible that he might have escaped injury if he had remained where he was, the most deliberate judgment would rather approve the wisdom of his course in attempting to find a safer place. Counsel for defendant argue that he might have stopped in the hollow, midway between the spur and the main tracks, but, if the cars were knocked off the track and down the bank, it does not appear to us that the hollow, between the banks, would have been a desirable stopping place. In any event, no matter what may be the aspect of the situation after the event, it appeared to him at the time that the danger that threatened was that the car that he was sitting on would be derailed and turned over into the hollow, and hence that it would be better for him to get further away. It is then argued, in effect, that, conceding that such a course was proper, still he should not have placed himself in the way of the on-coming log train, of which he knew, or should have known. Upon that subject, the boy testifies that he saw the engine with the cars following it, at the commissary, but that thereafter his interest was centered upon the engine, which entered the switch, and was coming down upon him; and, in view of the situation brought about by its approach, at a speed that seemed to threaten him with destruction, his explanation is natural enough. Moreover, he says that he did not know about drop switching, at that time, and his testimony leaves the impression that, if he had thought of the cars at all, it would have been to assume that they were following the engine into the switch. If, however, it were shown that he was familiar with drop switching, and had reason to believe, and did believe, when he first saw the engine and cars, that a drop switch was in contemplation, and that the engine would come into the switch whilst the cars would proceed on the main track, we are of opinion that he could not be held responsible for his error of judgment in getting on the main track, since he did so under pressure of an excitement created by the danger which was threatened by the engine, in consequence of the negligence of the engineer, and which he was endeavoring to escape.

The principle is well settled that one who negligently places another in danger cannot exact of him the exercise of the most de-

liberate judgment in his attempt to escape therefrom.

A good deal of emphasis is laid by plaintiff's counsel upon a rupture from which the boy is shown to have been suffering, and which they attribute to the accident; but the evidence leads us to believe that he had sustained that injury on some previous occasion, probably by jumping off his father's barn. His other injuries consisted of lacerations of the scalp and of the left leg and bruises from all of which he had pretty well recovered at the time of the trial. He suffered considerably, however, and was on crutches for several months, and we do not find the amount allowed excessive. On the other hand, we find no reason for increasing it.

The verdict and judgment appealed from are therefore affirmed.

PROVOSTY, J., dissents.